2023 IL App (1st) 211470-U

Nos. 1-21-1470, 1-21-1555, and 1-21-1590 (cons.)

Order filed December 22, 2023

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | Nos.   16 CR 13686 01 |
| | ) | 16 CR 13686 03 |
| MARSHALLA KELLY, | ) | 16 CR 13686 02 |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LITHIA HENDERSON n/k/a LITHIA CRAFTON, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| | ) | |

Nos. 1-21-1470, 1-21-1555, and 1-21-1590 (cons.)

|  |  |  |
|---|---|---|
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARSHALL HENDERSON, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Joseph M. Claps, |
| | ) | Judge, presiding. |

PRESIDING JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justice Mikva concurred in the judgment.
Justice Tailor concurred in part and dissenting in part

**ORDER**

¶ 1     *Held*:   We reverse the defendants' convictions for second degree murder and aggravated battery because the State failed to establish that the defendants were acting in unreasonable self-defense, and remand for the trial court to vacate the findings of guilt on the merged counts.

¶ 2     Following simultaneous but severed bench trials, defendants Marshalla Kelly, Marshall Henderson, and Lithia Henderson (now known as Lithia Crafton) were each found guilty of the second degree murder of Andre Jackson (720 ILCS 5/9-2(a)(2) (West 2016)).[1] Lithia was also found guilty of the aggravated battery of Daquan Jackson (720 ILCS 5/12-3.05(a)(1) (West Supp. 2015)).[2] Marshalla and Marshall were sentenced to 4 and 12 years' imprisonment for second degree murder, respectively. Lithia was sentenced to consecutive terms of 6 and 2 years' imprisonment for second degree murder and aggravated battery, respectively.

---

[1] Lithia Henderson filed a motion in this court to amend the notice of appeal to reflect that she legally changed her name to Lithia Crafton, which we allowed on July 13, 2022. For clarity, we will refer to the defendants by their first names.

[2] As Daquan Jackson shares the same last name as the deceased victim, Andre Jackson, we will refer to both by their first names.

¶ 3　　On this court's own motion, we consolidated the appeals of Marshalla (appeal number 1-21-1470), Lithia (appeal number 1-21-1555), and Marshall (appeal number 1-21-1590). In these consolidated appeals, Marshalla, Lithia, and Marshall each contend that the State (1) failed to disprove beyond a reasonable doubt that they acted in self-defense or defense of others, and (2) did not establish that they intended or knew their actions would cause death or great bodily harm to Andre.

¶ 4　　For the following reasons, we reverse the defendants' convictions and remand each case for the trial court to vacate the guilty findings on the counts that merged into the sentenced counts.

¶ 5　　　　　　　　　　　　　　　　BACKGROUND

¶ 6　　Marshalla, Lithia, and Marshall were charged by indictment with three counts of first degree murder (counts I-III) arising from Andre's death. Marshalla is Marshall's sister, and Lithia is Marshall's mother. Andre and Daquan are brothers. The murder counts alleged that, on August 4, 2016, Marshalla, Lithia, and Marshall, without lawful justification, beat and killed Andre knowingly or intentionally (count I), knowing their acts created a strong probability of death or great bodily harm (count II), and during the commission of a forcible felony, namely, mob action (count III). All three defendants were also charged individually with one count of mob action (counts IX-XI).

¶ 7　　Lithia was also charged with one count of attempted first degree murder of Daquan (count IV) and three counts of aggravated battery of Daquan for striking him and causing great bodily harm (count V), causing permanent disfigurement (count VI), and using a deadly weapon, namely, a bat (count VII). Marshalla was further charged with one count of aggravated battery of Daquan on a public way (count VIII).

¶ 8    Each defendant's answer to discovery asserted that he or she acted in self-defense and defense of others. Prior to trial, Lithia filed a motion to admit evidence of Andre's prior violent acts pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984). Marshalla and Marshall joined in the motion, which the trial court granted in part and denied in part.[3] The matter proceeded to simultaneous but severed bench trials.

¶ 9                                    Trial

¶ 10                              *Dione Brown*

¶ 11    At trial, Dione Brown, Andre's mother, testified that she was at home when Andre left the house with his brother, Daquan, at 9 or 9:15 p.m. on August 4, 2016. When they returned approximately 15 minutes later, Andre was "breathing hard," appeared "shaken," and had blood on his shirt. Daquan appeared nervous and was bleeding from the ear. Brown called the police, who took Andre to the hospital where he died.

¶ 12    On cross-examination, Brown stated that she did not know where Andre and Daquan were going or that they were planning to engage in a fight.[4] When they returned, Brown saw blood on Andre's shirt but did not find where he was bleeding from, and "the top part of [Daquan's] ear was hanging." Brown stated that Andre was 6'1, but she denied that he weighed 375 pounds.

¶ 13                              *Almelia Triplett*

---

[3] The trial court's ruling on the *Lynch* motion is not at issue on appeal.

[4] Most witnesses for the State were cross-examined separately by the three defendants' counsels. Generally, each defense counsel also adopted the cross-examinations by counsels for the other defendants. Therefore, we only note instances where the cross-examinations were not adopted by particular counsels. Here, Marshalla's counsel did not question Brown on cross-examination, nor adopt the cross-examinations by Lithia's and Marshall's counsels.

¶ 14    Almelia Triplett testified that Andre was her boyfriend and they had children together. Triplett and Marshalla were "best friend[s]," and Triplett knew Marshall and Lithia, with Lithia being "like a mom" to Triplett. A few weeks prior to the incident, Triplett and Marshalla argued about Triplett owing Marshalla money for Marshalla styling her hair. Triplett informed Andre about the argument, and Andre argued with Marshalla and Marshalla's boyfriend, Devon Powell, through text messages.

¶ 15    On August 4, 2016, Triplett, Andre, and other people visited Daquan's house. At night, Andre and Daquan left for Lithia's house. When they returned 20 to 30 minutes later, Andre's shirt was "covered in blood" and he could "barely" walk, stand, or drink water.

¶ 16    Triplett identified a video, which the State published and this court has reviewed, depicting Andre's uncle assisting Andre to a stretcher by bearing Andre's weight and Andre being placed in an ambulance. Triplett also identified a printed copy of Lithia's Facebook page and testified that she viewed certain videos on the Facebook page.

¶ 17    During counsel for Marshalla's cross-examination, Triplett agreed that her argument with Marshalla "got heated."[5] Triplett stated that she "took [herself] out of the equation," so the fight developed between Powell, Andre, and Marshalla. Triplett saw text messages wherein Marshalla threatened her and stated that "if she catch [*sic*] me [Triplett], she was going to stomp my baby out of me." Marshalla never attacked Triplett, Andre, or Daquan; she only interacted with them through Facebook and text messages. Andre was 6'1 or 6'2, and Daquan was slightly shorter, but both were larger than Marshall and Marshalla.

---

[5] Only counsel for Lithia adopted the other defense counsels' cross-examinations of Triplett.

¶ 18    During counsel for Lithia's cross-examination, Triplett stated that the argument between Marshalla and Triplett began about payment over hairstyling and escalated into "taunting and name-calling." Eventually, Andre and Powell "got involved." At first, Lithia attempted to stop the hostile text messages and fighting between Marshalla and Triplett.

¶ 19    During counsel for Marshall's cross-examination, Triplett stated that Marshall was not involved in the argument between Triplett and Marshalla.

¶ 20    On redirect examination, Triplett testified that Lithia weighed approximately 320 pounds on August 4, 2016.

¶ 21                                *Daquan Jackson*

¶ 22    Daquan testified that he and Andre traveled to Lithia's house shortly after 9 p.m. on August 4, 2016, because Andre wanted to fight Powell. Neither Andre nor Daquan were armed.

¶ 23    When Andre and Daquan arrived, Marshall and Powell were on the porch. Powell and Andre then "started a scuffle" near a vehicle and threw "a couple punches." Daquan and Marshall stood nearby. Powell and Andre then "grabbed each other," so Marshall "jumped in" to punch Andre. Daquan punched Marshall. Lithia then approached with a metal baseball bat and hit Daquan on the head, causing him to see "stars" and lose feeling in his legs.

¶ 24    Andre and Marshall continued "tussling" and "ended up on the ground" with Andre on top. Lithia struck Andre's back with the bat at least three times. Marshalla retrieved a broomstick from the house and used it to poke and hit Andre's back until the broomstick broke. When Daquan tried to approach the fight, Lithia swung the bat at him.

¶ 25    Daquan then went to Andre's vehicle to look for something "to help" but did not find anything. After the broomstick broke, Marshalla retrieved a "two-by-four" from the house. She

"stuck it in between [a] gate and tried to hit Andre, but she didn't connect." According to Daquan, the two-by-four hit "either the top of the fence or the bottom of the fence and it popped out of her hands." Next, Marshall grabbed the two-by-four and hit Andre, who was in the fetal position. Daquan believed Marshall hit Andre twice across the back. Andre was "balled up" and covering his head. Powell took the two-by-four from Marshall, and Marshall then "banged" Andre's head against the ground and punched his face "a few times." While Marshall was hitting Andre with the two-by-four, Marshalla returned to the house to retrieve her phone.

¶ 26    The State published a video depicting the last 10 seconds of the fight. Daquan identified the individuals in the video and testified that Marshalla filmed it. The video is included in the record on appeal and has been viewed by this court. It depicts Marshall standing over Andre, who is on the ground on his side. Marshall holds Andre's hair with his right hand and punches Andre's face with his left fist. Then, Andre covers his head with his arms. During these events, Marshalla can be heard repeating in an excited tone that Andre is "on the ground."

¶ 27    Daquan testified that the fight ended after Powell took the two-by-four from Marshall. Andre looked exhausted and a "little beat up," so Daquan helped him stand and walk to the vehicle. Daquan drove them to Brown's house. During the drive, Andre was breathing heavily and commenting that he was tired. When they arrived, Daquan assisted Andre up the stairs because Andre was too weak to go alone. When Lithia hit Daquan with the baseball bat, the bat "split" his left ear, which was later treated with 12 stitches.

¶ 28    Shortly afterward, Daquan told Chicago police officer Munch that he was not sure what had happened to Andre or who did it to him, but that Triplett knew the perpetrator.[6] At the time,

---

[6] Officer Munch's first name does not appear in the record on appeal.

Daquan was trying to leave to go to the hospital and could not name the offenders. He did not know Marshall, Lithia, and Marshalla, although he "knew of them."

¶ 29    On August 8, 2016, a detective showed Daquan four photo arrays wherein Daquan identified Marshalla, Marshall, Lithia, and Powell. Daquan signed the photo arrays and consent forms, which are included in the record on appeal.

¶ 30    On January 10, 2020, Daquan spoke with assistant public defender Caroline Glennon. Glennon asked Daquan whether he remembered what happened, and Daquan said no because he did not want to speak with her.

¶ 31    On cross-examination, Daquan stated that when he arrived at Lithia's house, he believed that Andre and Powell would fight. Andre grabbed Powell, who "came out of his shirt." Daquan denied approaching Powell, assuming a fighting stance, or "dancing around" him as if they would fight. The fight did not begin with Marshall and Andre but, at some point, Marshall and Andre began fighting and, after Andre was hit, they fell to the ground.

¶ 32    Daquan agreed that he fought Marshall, but denied stomping and kicking Marshall in the head. Daquan denied that Lithia exited the house with a baseball bat at that point. Daquan denied previously seeing Andre with a firearm, finding a wrench in Andre's vehicle, or swinging a wrench at Lithia. Daquan and Andre were both 6'0 and weighed approximately 200 pounds at the time of the incident, and Marshall was "significantly shorter" than Andre. Daquan denied that, when Andre was on top of Marshall, Andre was "winning" the fight; rather, Marshall got on top of Andre when Lithia pushed Andre over with the baseball bat. Daquan and Andre did not go to the hospital then because Daquan did not believe that Andre was "that hurt."

¶ 33    On redirect examination, Daquan testified that he did not involve himself with the fight when Marshall was beating Andre because Daquan did not want to get hit with the baseball bat.

¶ 34                                    *Devon Powell*

¶ 35    Powell testified that he and Marshalla had a child together but were no longer in a relationship.[7] At the time of the incident, Powell, Marshalla, Powell and Marshalla's child, Marshall, and Lithia all resided at Lithia's house. Powell knew that Marshalla and Triplett had a conflict, which Andre "extended" to Powell through text messages, FaceTime calls, and in-person interactions. On June 13, 2016, Andre contacted the residents of Lithia's house using FaceTime and showed that he was outside.

¶ 36    Powell identified printouts of Lithia's Facebook page as it appeared in August 2016. The printouts of Lithia's Facebook page are included in the record on appeal. The printouts include a post by Lithia from August 4 at 10:48 p.m. stating, "A mf thought he was tough brought his a** to my crib tryna [*sic*] jump on my son and son in law and got his a** beat the f*** up we does [*sic*] this you not going to pull up on my kids and not get beat video cuming [*sic*] soon." A post from August 4 at 11:20 p.m. has a picture of Lithia's hand with a caption stating that she broke her nail "beating a mf." A third post under Lithia's name from "Yesterday at 12:00 a.m." depicts the video taken by Marshalla of the end of the fight and the caption, "My son in the purple shirt beating his [*sic*] big a** big a** punk."

¶ 37                                    *Dr. Ponni Arunkumar*

---

[7] Both the State and each defendant called Powell in their cases-in-chief. However, due to a scheduling issue and by agreement of the parties, the trial court allowed the defendants to call Powell first, before the State. The information in this paragraph is taken from Powell's testimony during the defendants' cases-in-chief, but placed here as background.

¶ 38     Dr. Ponni Arunkumar, the Cook County chief medical examiner, testified that she reviewed Andre's autopsy report. Dr. Arunkumar testified that Andre was 6'2 and weighed 376 pounds. The sclerae of Andre's eyes were yellow, which suggested liver failure. Andre had 13 blunt force injuries to his face, arms, shoulders, torso, legs, and head. Some of the injuries were to muscles, which require more force than injuries to the skin.

¶ 39     An injury to Andre's left elbow was consistent with being struck with an object like a broom stick. An injury to his right leg showed "skin slippage," which can result from the tissue becoming necrotic. Injuries on his back were deep intramuscular hemorrhages. Andre's brain was swollen, which could have been caused by a blow to the head or decreased oxygen due to the body failing from the other injuries.

¶ 40     Andre's pathological diagnoses were multiple blunt force injuries due to an assault, complications from the blunt force injuries, including acute kidney injury and multiorgan system failure, and injuries caused by a lack of blood to the brain. Andre was obese, but that did not contribute to his death. Dr. Arunkumar opined that the cause of Andre's death was multiple blunt force injuries and the manner of death was homicide.

¶ 41     On cross-examination, Dr. Arunkumar stated that Andre did not have broken bones or a brain hemorrhage. The physician who examined Andre on August 7, 2016, "did not see any injuries." The subsequent CT scan of Andre's head revealed no hemorrhaging or skull fractures, but showed "traumatic ischemia of muscles." Many organs were intact, and he did not suffer acute traumatic injury to the soft tissue of his chest. The CT scan of Andre's head revealed no evidence of injury or hemorrhaging. Dr. Arunkumar agreed that the injuries could have occurred due to a fight.

¶ 42                                    *911 Calls*

¶ 43    Lithia's counsel introduced a stipulation which was adopted by counsels for Marshalla and Marshall that an employee at the Office of Emergency Management and Communications in Chicago (OEMC), would testify that the audio file of a 911 call placed at Lithia's residence on June 18, 2016, was not retained in the OEMC system. However, the printout of the "CAD event query" for the incident was available at trial and "truly and accurately depicts the call." The employee would testify that a Chicago police unit was dispatched to Lithia's house as a result of the phone call. Further, OEMC received another 911 call from Lithia's residence on August 4, 2016, for which the audio was available.

¶ 44    Both the OEMC event query report for June 18, 2016, and the audio recording of the August 4, 2016, 911 phone call were admitted at trial. The report states that the June 18, 2016, caller informed the police that Andre and another man attempted to enter the home with a firearm. In the recording of the August 4, 2016, 911 phone call, a woman asks for a squad car at Lithia's residence because two people "just pulled up on [her] brother and [her] baby daddy" and were attempting to fight them.

¶ 45                                    *Devon Powell*

¶ 46    Lithia's counsel called Powell for her case-in-chief, and the testimony was adopted by counsels for Marshalla and Marshall. Powell testified that on the evening of August 4, 2016, he was at Lithia's house when he began receiving "aggressive" Facebook messages from Andre. Eventually, Andre messaged that he was at Lithia's house. At approximately 9:20 p.m., Powell saw Andre and Daquan and left the house to try to assuage the situation. Andre "rushed" Powell and grabbed him, which caused Powell's shirt to come off. Powell was 5'11 and weighed

approximately 150 pounds. Daquan approached with his fists raised as if he was about to join the fight. Powell did not punch anyone that night.

¶ 47    Marshall, who was previously in the house, "came out of nowhere" to assist Powell. Then, Andre and Marshall began fighting. Daquan approached Powell, who did not want to fight but assumed a fighting stance in case "anything happened." Daquan then approached Marshall and Andre, who were on the ground with Andre on top of Marshall, and kicked Marshall in the head. When that happened, Lithia, who was on the porch, descended the stairs and kicked Andre "in the butt." Andre kicked Lithia's leg, fell to the ground, and Marshall got on top of him. Marshalla exited the basement of the residence "with a two-by-four," but Powell took it from her because Marshall was winning the fight. Powell threw the two-by-four into the house.

¶ 48    Daquan went to Andre's van and returned with a wrench, which he began swinging at Lithia. Lithia held a baseball bat, but did not strike Daquan with it. At this point, Andre was on the ground and losing the fight to Marshall, who was standing; both were tiring. Powell never saw Marshall use any objects to hit Andre. Powell stopped the fight between Andre and Marshall by pulling Marshall's shirt and informing him that "it was too much." Marshall then returned to the house. Lithia's defense counsel played the August 4, 2016, 911 call for Powell, who identified the caller as Marshalla.

¶ 49    Powell testified that the entire incident took approximately seven minutes. After the fight, Andre stood and walked to the driver's seat of the vehicle, and Daquan entered the passenger side of the vehicle. At the time of the event, Powell did not believe the fight was "that big of a deal."

¶ 50    On cross-examination by the State, Powell stated that nobody present during the incident had a firearm. Powell never saw Marshalla hit Andre with a broomstick before she retrieved the

two-by-four. Powell did not see Marshall take the two-by-four from Marshalla and hit Andre with it. Lithia used a metal baseball bat to hit Andre twice "on the butt," and Andre then kicked her in the shin, so Lithia hit Andre on "the butt" again with the bat. After Lithia intervened with the baseball bat, Marshall got on top of Andre and began "winning" the fight.

¶ 51    When Marshalla exited the house with the two-by-four, Marshall was already on top of Andre. Marshall used his fists to hit Andre, who did not hit him back. Powell agreed that, at this point, Andre was "covering up trying to protect himself." Powell pulled Marshall off Andre because Powell felt the fight was "too long" and had become "senseless," as Marshall had been hitting Andre for two to three minutes. Approximately 10 seconds passed between Daquan kicking Marshall in the head and Lithia retrieving a baseball bat. Marshalla's "attempts to hit Andre" spanned approximately five seconds.

¶ 52    On Lithia's defense counsel's redirect examination, Powell testified that when Daquan swung the wrench at Lithia, Lithia did not swing "back."[8]

¶ 53    On Marshall's defense counsel's redirect examination, Powell testified that when Daquan kicked Marshall, it was "more like a stomp than a kick" because he struck Marshall's head with the bottom of his foot. Andre was on top of Marshall and placed his whole weight on Marshall when they moved to the ground.

¶ 54                            *Detective Steven Smith*

¶ 55    In rebuttal to Lithia's case-in-chief, the State presented Chicago police detective Steven Smith, who testified that he and Detective Shamus Fergus interviewed Lithia on the evening of

---

[8] Lithia's and Marshall's defense counsels separately questioned Powell upon redirect examination, and neither adopted the redirect examination of the other. Marshalla's counsel did not question Powell or adopt the redirect examination of the other counsels.

August 12, 2016, into the following morning. The interview was audio and video recorded, and Smith identified the relevant video clip and testified that it accurately recorded the interview. The video clip, which was published, is included in the record on appeal and has been viewed by this court.

¶ 56    In the video, Lithia informs the detectives that she exited the house and saw Andre and Marshall fighting, and Powell and Daquan also fighting but not hitting each other. Lithia states that she informed "them" to "go about y'all's business, I'm calling the police." They continued to fight even as Lithia approached them. Lithia states that Marshalla had the broomstick at this point.

¶ 57                              *Detective Tony Noradin*

¶ 58    In rebuttal to Marshalla's case-in-chief, the State presented a stipulation that Chicago police detective Tony Noradin would testify that he and Detective Fergus interviewed Marshalla on the evening of August 12, 2016, and the following morning. Noradin would identify a CD containing audio and video clips from the interview, and testify that the videos were fair and accurate recordings of the interview. The video of the compiled clips was published, is included in the record on appeal, and has been viewed by this court.

¶ 59    In the video, Marshalla informs the detectives that she used a broom stick to strike Andre and Daquan, and it broke "in like two hits." Marshalla further states that she went inside the house to retrieve an item once she determined that Powell and Marshall could "handle it" because the fight was "two on two"; Marshalla trails off at this point and does not specify which item she retrieved from the house. Marshalla agrees with the detectives' summary that Daquan was hit with the bat and then went to the vehicle, because "up until that point he had nothing in his hands."

Marshalla also informs the detectives that, at the end of the fight, Daquan drove away in a vehicle with Andre in the back seat.

¶ 60                                                    *Closing Arguments*

¶ 61    In closing, Marshalla's defense counsel argued that the incident was a case of "self-defense" where a person accidentally died. According to counsel, Daquan and Andre were the aggressors and were "substantially bigger" than Marshalla and her family members. Counsel argued that charging all three defendants was "flat out wrong" because they were acting in self-defense. Further, there were "no rules" in a fight, and nothing "in the law" suggests any time limit on the length of a fight. Lastly, Marshalla knew Andre "for a long time," did not attempt to kill him, and was surprised when she discovered that he had died.

¶ 62    Lithia's defense counsel argued that it was "never *** going to be a one on one fight." Counsel contended that the incident was not the first time Andre traveled to Lithia's home to start a fight, and he was, thus, the aggressor. Lithia, therefore, had the right to defend her son from being beaten by a man much larger than him. Moreover, Andre's injuries were inconsistent with an intentional crime. When the court questioned counsel regarding the moment when Marshall reversed his position to get on top of Andre, counsel agreed with the court that Lithia's involvement "turned the tide." Regardless, counsel contended that Daquan was not credible, and Lithia intended to defend herself and her child.

¶ 63    Marshall's defense counsel argued that Marshall, who was smaller than Andre, intervened in the fight between Andre and Powell to protect Powell. Counsel contended that the fight happened quickly. Marshall met "force with force" and, when Powell stopped the fight, Marshall

did not reengage. Counsel argued that Marshall did not use more force than necessary to stop the attack on him, his friend, and his home, and did not intend to kill Andre.

¶ 64                                          *Ruling*

¶ 65    The court found the defendants guilty of second degree murder with respect to counts I (knowing or intentional murder) and II (strong probability murder). It found them not guilty of mob action (counts IX-XI) or felony murder premised upon mob action (count III). The court also found Lithia guilty of two counts of aggravated battery of Daquan premised on causing great bodily harm (count V) and using a deadly weapon (count VII), and not guilty of attempted murder (count IV) and aggravated battery causing permanent disfigurement (count VI). Lastly, the court found Marshalla guilty of aggravated battery of Daquan on a public way (count VIII). The court concluded that Marshalla, Lithia, and Marshall acted in concert and were accountable for each other's conduct, and the force they used to defend themselves and each other became unreasonable.

¶ 66                          *Posttrial Motions and Sentencing*

¶ 67    Each defendant filed a motion for a new trial, arguing in relevant part that he or she was justified in using force against Andre. The court denied each motion, but vacated Marshalla's aggravated battery conviction upon the State's motion.

¶ 68    The cause proceeded to separate sentencing hearings for each defendant. Following the hearings, the trial court merged the defendants' respective second degree murder count I into count II, which was premised on strong probability of death or great bodily harm (720 ILCS 5/9-2(a)(2) (West 2016)). It sentenced Marshall to 12 years' imprisonment, Marshalla to 4 years' imprisonment, and Lithia to 6 years' imprisonment on this charge. The court also merged Lithia's aggravated battery counts and sentenced her to a consecutive term of two years' imprisonment for

aggravated battery causing great bodily harm (count V). The court denied Marshall's and Lithia's motions to reconsider sentence; Marshalla did not file a motion directed at her sentence.

¶ 69                                        ANALYSIS

¶ 70                                  Second Degree Murder

¶ 71    On appeal, each defendant first argues that the State failed to prove that he or she committed second degree murder. Specifically, they argue that the State failed to disprove beyond a reasonable doubt that they acted in self-defense or defense of others when they struck Andre. Each defendant contends that Andre was the aggressor and was larger than Marshall, with whom he was brawling, so their use of force was reasonable and justified under the circumstances. Further, Marshalla and Lithia argue that because their use of force was reasonable, no crime was committed for which they could be held accountable. Lithia additionally argues that the State failed to prove that she committed aggravated battery because she was acting in self-defense and defense of others when she struck Daquan with the baseball bat.

¶ 72    The standard of review for a challenge to the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Belknap*, 2014 IL 117094, ¶ 67. The trier of fact resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from basic facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. Accordingly, this court will not retry the defendant or substitute its judgment for that of the trier of fact on the weight of the evidence or credibility of witnesses. *Id.* A reviewing court must allow all reasonable inferences from the record in favor of the prosecution (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)) and will not reverse a

conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt" (*People v. Jackson*, 232 Ill. 2d 246, 281 (2009) (internal quotation marks omitted)). Second degree murder is a lesser mitigated, not a lesser included, offense of first degree murder. *People v. Jeffries*, 164 Ill. 2d 104, 122-23 (1995). The elements of the two offenses are identical, but the presence of a statutory mitigating factor reduces unlawful homicide from first degree murder to second degree murder. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 153.

¶ 73    Section 9-2 of the Criminal Code of 2012 (720 ILCS 5/9-2 (West 2016)) provides for two forms of second degree murder. See *Castellano*, 2015 IL App (1st) 133874, ¶ 148. Relevant here is the second form, which occurs when "at the time of the killing [the offender] believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable." 720 ILCS 5/9-2(a)(2) (West 2016). Known as imperfect self-defense, this form of second degree murder " 'occurs when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable.' " *Castellano*, 2015 IL App (1st) 133874, ¶ 148 (quoting *Jeffries*, 164 Ill. 2d at 113).

¶ 74    Self-defense is legal justification for first degree murder. *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 54. "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a) (West 2016). However, force that is intended or likely to cause death or great bodily harm is justified only if the person "reasonably believes that such force is necessary to prevent imminent death or great bodily harm

to himself or another, or the commission of a forcible felony." *Id.* "A defendant need not 'exercise infallible judgment,' only 'reasonable judgment under the existing circumstances.' " *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 55 (quoting *People v. Evans*, 259 Ill. App. 3d 195, 210 (1994)). The defendant's perception of danger, rather than the actual peril, is dispositive. *Id.* ¶ 108. The elements of self-defense are:

> "(1) unlawful force threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the person threatened were objectively reasonable." *People v. Gray*, 2017 IL 120958, ¶ 50.

¶ 75 To prove first degree murder after a defendant has, as here, raised self-defense, the State must prove beyond a reasonable doubt that one of the six factors is not present. *Castellano*, 2015 IL App (1st) 133874, ¶ 149. However, to be found guilty of second degree murder, the defendant must prove by a preponderance of the evidence that the first five factors are present. *Id.*

¶ 76 As charged, to prove first degree murder, the State had to prove the defendants killed Andre, knowing their actions created a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(2) (West 2016). To prove second degree murder, the State had to prove first degree murder and that, at the time of the killing, the defendants believed circumstances existed which would justify or exonerate the killing, but the belief was unreasonable. 720 ILCS 5/9-2(a)(2) (West 2016).

¶ 77 As noted, if the State negates any element of self-defense, the self-defense claim fails. *Gray*, 2017 IL 120958, ¶ 50. The trial court may then consider whether the defendant is guilty of

second degree murder, *i.e.*, whether a mitigating circumstance existed. *People v. Spiller*, 2016 IL App (1st) 133389, ¶¶ 29-30. Whether a mitigating circumstance existed is a question of fact. *People v. Bennett*, 2017 IL App (1st) 151619, ¶ 43. Although the burden of proof remains with the State to prove beyond a reasonable doubt each element of first degree murder and the absence of mitigating circumstances, it is the defendant's burden to prove a mitigating factor by a preponderance of the evidence. 720 ILCS 5/9-2(c) (West 2016). Marshalla, Marshall, and Lithia do not contest that their actions caused Andre's death. Rather, they contend that their belief that circumstances existed to justify the use of force was reasonable and justified, and this court should therefore reverse each defendant's second degree murder conviction.

¶ 78    We agree with defendants. Even viewing the evidence in the light most favorable to the State, no rational trier of fact could conclude that Marshalla, Marshall, and Lithia did not act in reasonable self-defense during the encounter.

¶ 79    As an initial matter, the trial court found that Marshalla, Marshall, and Lithia were accountable for each other's conduct. The record establishes that they acted in a common design to beat Andre. Thus, "any acts in furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts." 720 ILCS 5/5-2(c) (West 2020). As defendants engaged in this common design, the doctrine of self-defense or defense of others applies to each defendant for his or her individual conduct during the fight.

¶ 80    First, the evidence established that when Andre and Daquan arrived at Lithia's house on August 4, 2016, Lithia's family had reason to believe that Andre would hurt or kill them due to the dispute that occurred a few weeks prior. What began as a feud between Marshalla and Triplett

extended to their boyfriends, Powell and Andre. Over the next few weeks, Andre became increasingly hostile toward the family, threatening them repeatedly, in text message conversations and in person. On June 18, 2016, specifically, the residents of Lithia's house placed a 911 call wherein they informed the police that Andre had attempted to break into their house with a firearm. Accordingly, during the incident at issue, the defendants reasonably believed that Andre would use deadly force against one or all of them.

¶ 81    Additionally, the circumstances of the fight support the conclusion that each defendant reasonably acted in self-defense or defense of others. Andre, the initial aggressor, was much larger than Marshall, and, initially, was "winning" the fight. Andre was 6'2 and 376 pounds, while Marshall was only 5'4 and 165 pounds. Daquan and Powell both testified that during the early parts of the fight, Andre and Marshall were on the ground with Andre on top of Marshall. Assisted by Marshalla and Lithia, who wielded bludgeons, Marshall eventually overpowered Andre.

¶ 82    When Lithia struck Andre with the baseball bat, causing Marshall and Andre to switch positions and allowing Marshall to begin "winning" the fight, Marshall did not withdraw, but continued to punch and beat Andre. Although the State contends that Marshall, Marshalla, and Lithia continued to beat Andre when he was lying on the ground, beyond the point where he was a threat, we note that the entire fight lasted approximately 7 to 10 minutes. During such a short period, and under such great stress, defendants had no time or space to evaluate their peril as a detached observer would. As noted, defendants need not exercise "infallible judgment," and, especially given their recent relationship with Andre, their perception of the danger he represented is dispositive. See *Harmon*, 2015 IL App (1st) 122345, ¶¶ 55, 108.

¶ 83    To expand upon the last point, Daquan testified that after the fight ended, Andre looked

exhausted and a "little beat up." Rather than seek immediate medical care, however, Andre and Daquan returned home and only sought medical attention later that evening. Three days after the fight, Andre's treating physician "did not see any injuries." The Report of the Postmortem Examination, contained in the record on appeal, states that defendant was pronounced dead on August 9, 2016. Dr. Arunkumar, the medical examiner, testified that Andre died from complications related to blunt force injuries. Medical professionals were unable to determine the severity of Andre's injuries until after his death, which occurred five days after the fight. If trained professionals were unable to determine that Andre sustained life-threatening injuries, it is reasonable that defendants, who were under high stress during the fight, were unable to determine whether their actions exceeded what was necessary to defend themselves.

¶ 84    For the reasons stated above, the State did not meet its burden in establishing that any of the defendants' actions during the fight were unreasonable self-defense or defense of others, and thus the evidence was insufficient to prove them guilty of second degree murder. See *Belknap*, 2014 IL 117094, ¶ 67.

¶ 85    Lithia also contests her aggravated battery conviction on the same basis. She contends that she was acting in reasonable self-defense or defense of others when she hit Daquan with the baseball bat. We agree. The State presented evidence that Daquan punched Marshall, which prompted Lithia to hit Daquan on the head, causing him to see "stars" and lose feeling in his legs. Lithia only hit Daquan immediately after he attacked Marshall, and did not strike him again during the fight. We, thus, find that the evidence was insufficient to sustain Lithia's conviction for aggravated battery, and the conviction must be reversed. See *id.*

¶ 86                                    Merger

¶ 87    Given that the State failed to prove that defendants were not acting in reasonable self-defense when they fought Andre, the evidence was also insufficient to sustain the findings of guilt on the second degree murder (count I) and aggravated battery (Lithia count VII) counts that were merged into their convictions on counts II and V.

¶ 88    Consequently, we remand for the trial court to vacate the findings of guilt on defendants' merged counts for second degree murder (count I) and on Lithia's merged count for aggravated battery premised on the use of a deadly weapon against Daquan (count VII). See Ill. S. Ct. R. 615(b)(2) (eff. Jan. 1, 1967).

¶ 89                          CONCLUSION

¶ 90    For the foregoing reasons, we reverse Marshall's, Marshalla's and Lithia's convictions for second degree murder (count II) and Lithia's conviction for aggravated battery (count V). We remand each case with instructions to vacate the findings of guilty on the merged counts (counts I and VII).

¶ 91    Appeal number 1-21-1470, reversed and remanded with directions.

¶ 92    Appeal number 1-21-1555, reversed and remanded with directions.

¶ 93    Appeal number 1-21-1590, reversed and remanded with directions.

¶ 94    JUSTICE TAILOR, concurring in part and dissenting in part:

¶ 95    I concur in the majority's decision that the State failed to disprove Marshalla Kelly and Lithia Henderson were acting in defense of Marshall Henderson. However, I dissent from the majority's decision that the State failed to disprove Marshall was acting in self-defense when he physically beat Andre Jackson so severely and "senseless[ly]" that Andre later died from his injuries. Viewing the evidence in the light most favorable to the State, although Marshall initially

- 23 -

acted in self-defense, a reasonable factfinder could conclude that his actions devolved from self-defense to retaliation when Marshall continued to strike Andre for several minutes with a two-by-four and his fists after Andre was already on the ground curled up in a fetal position and was not resisting or fighting back.

¶ 96    Marshall, who was not the initial aggressor, began fighting with Andre after Devon Powell and Andre "grabbed each other." Andre substantially outweighed Marshall and, initially, Andre was on top of Marshall as they fought on the ground.  However, Lithia then struck Andre with a baseball bat, which allowed Marshall to get out from underneath Andre and get on top of him, at which point Marshall was "winning" the fight. From that moment forward, neither Lithia nor Marshalla were involved in the fight.

¶ 97    After Marshall obtained the upper hand and got on top of Andre, he continued to strike Andre for two to three minutes.   The State presented evidence that as Andre lay on the ground in a fetal position, Marshall hit Andre with a piece of two-by-four lumber two or more times. Daquan Jackson, Andre's brother, testified that as Andre lay curled up on the ground attempting to cover his head, Daquan saw Marshall bang Andre's head into the ground a couple of times and punch Andre's face several times. The video of the last ten seconds of the fight shows Marshall standing over a prone Andre, holding Andre's head up by his hair and punching his face while Andre attempts to shield himself. Powell, who is the father of Marshalla's child, testified that he pulled Marshall off Andre shortly after the video concluded, because Marshall's actions had become "too long" and were "senseless."

¶ 98    The medical examiner testified that Andre died from multiple blunt force injuries and resulting complications, and that he had 13 injuries over his body. The medical examiner found

Andre's brain was swollen, which could have been caused by blows to his head, and that he had a four-inch linear abrasion on his back.

¶ 99   The majority contends that "[d]uring such a short period, and under such great stress, defendants [including Marshall] had no time or space to evaluate their peril as a detached observer would" and did not need to "exercise 'infallible judgment' *** especially given their recent relationship with Andre." I disagree because this fight occurred over several minutes, not a few seconds, and on this evidentiary record, a reasonable factfinder could conclude that it had become objectively unreasonable for Marshall to believe he was still acting in self-defense after Andre stopped resisting. Yet, Marshall continued to beat Andre with a two-by-four, bang his head off the ground and punch him repeatedly for two to three more minutes.

¶ 100   "A person is justified in the use of force against another when and to the extent he reasonably believes that such conduct is necessary to defend himself *** against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a) (West 2018). Self-defense is negated when a person continues to use force beyond a point where, acting as a reasonable person, he would realize that further force is no longer necessary. *In Interest of D.N.*, 178 Ill. App. 3d 470, 474 (1988). This is true even where the action is continuous. *Id*. Once a defendant asserts self-defense as an affirmative defense and offers some evidence to support that defense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense and the proper "standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in self-defense." See *People v. Gray*, 2017 IL 120958, ¶ 50-52. Taking the evidence in the light most favorable to the State, I would find that a rational trier of fact could find that Marshall's

belief in the amount of force necessary to subdue Andre and the necessity of continuing to use substantial force after Andre stopped putting up resistance was not objectively reasonable and that Marshall's actions devolved from self-defense to retaliation.

¶ 101    Andre was the initial aggressor and was substantially larger than Marshall. However, the evidence established that after Marshall got on top of Andre and was "winning the fight," Andre stopped resisting. Nevertheless, with Andre on the ground curled up in a fetal position, Marshall continued to beat Andre for two to three more minutes by striking him two or more times with two-by-four lumber, banging Andre's head on the ground multiple times, and striking Andre's face with his fist multiple times, as testified to by Daquan and Powell, and depicted in part in the video. Powell, Marshall's ally, testified that he had to pull Marshall off Andre because the fight had become "senseless" and "too long." A video from a body camera worn by paramedics transporting Andre from his home to the ambulance in an emergency medical evacuation chair shows that Andre could not hold his head or body upright.

¶ 102    Support for my conclusion can be found in other cases where we have found that justifiable self-defense became unreasonable self-defense. In *People v. Tirrell*, we held that the defendants were not acting in self-defense when they continued to beat and kick the victim after he was disarmed and under a vehicle, in part, because the right to self-defense does not permit the pursuit or killing of the initial aggressor in retaliation or revenge after he retreats. 87 Ill. App. 3d 511, 517-18 (1980). In *In re D.N*, we found defendant's assertion that she acted in self-defense negated when she continued her aggression beyond a reasonable need for self-defense by striking the victim after the victim hit the floor and was no longer in a position to take offense against the defendant, even though there was no interval in time between justified and unjustified self-defense.

178 Ill. App. 3d 470, 473-74 (1988). Similarly, in *People v. Willis*, we held that the defendant continued his aggression beyond a reasonable need for self-defense when he continued to stab his aggressor after the aggressor was already wounded, had no weapon, and attempted to remove himself from the altercation. 210 Ill. App. 3d 379, 385 (1991). On the other hand, in *People v. Bailey*, we found the State did not disprove self-defense when it failed to offer evidence that sufficient time passed for defendant to realize that further shooting was unnecessary when only a few seconds separated the first and last gunshot. 27 Ill. App. 3d 129, 134-36 (1975).

¶ 103   The majority also asserts that because Marshalla, Lithia, and Marshall "acted in a common design to beat Andre" they "were accountable for each other's conduct." If the majority's implication is that, under the State's accountability by common design theory, there are only two possible outcomes here, either that all are guilty of second degree murder or all defendants are not guilty of second degree murder, then I disagree.  The majority and I agree that Marshalla, Lithia, and Marshall did not set out to commit a crime, let alone one by common design. To prove common design, there must be evidence that the defendants attached themselves to "a group bent on illegal acts with knowledge of its design." *People v. J.H.*, 136 Ill. 2d 1, 17 (1990); see *People v. Terry,* 99 Ill. 2d 508, 511 (1984) (group conspired to commit battery, but result of the concerted acts was murder, for which all were held accountable).

¶ 104   Andre was the aggressor. Marshall initially acted in defense of himself. At that time, Marshalla and Lithia acted in defense of Marshall. Thus, the defendants here were not part of a common design to commit a crime in the first instance. Marshall's continued aggression against Andre after Andre stopped resisting ultimately became objectively unreasonable, but the record does not support the notion that Marshalla and Lithia engaged in a common design with Marshall

to commit second degree murder once Marshall's use of force became objectively unreasonable. Marshalla and Lithia had clearly withdrawn from the fight once Marshall got on top of Andre and, therefore, they cannot be accountable for Andre's murder.

¶ 105   I concur in the decision to reverse Marshalla Kelly and Lithia Henderson's convictions but would affirm Marshall Henderson's conviction for the second degree murder of Andre Jackson.